John H. Azeltine, Jr.
2419 S. Hemlock Strav.
Tucson, AZ  85713
(520) 260-1173

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

JOHN H. AZELTINE, JR.

    Plaintiff,

vs.

BANK OF AMERICA, et al.
    **Defendant.**

CIV 10-218-TUC HCE

COMPLAINT

## JURISDICTION AND VENUE

U.S. DISTRICT COURT OF ARIZONA - TUCSON

Evo A. DeConcini U.S. Courthouse
405 W. Congress Street, Suite 1500
Tucson, Arizona  85701

## PARTIES

JOHN H. AZELTINE, JR., a private person residing in Tucson, Arizona

BANK OF AMERICA, et al., a nationwide banking chain with aproximately 20 locations in Tucson, Arizona

## COMPLAINT

Plaintiff JOHN H. AZELTINE, JR., ("the CUSTOMER"), brings this action against the Defendant BANK OF AMERICA, et al., ("the BANK"), on the knowledge that the BANK did willfully and knowingly:

A.) Breach the BANK's own policy against disclosure of Non-Public Information (NPI) with Non-Affliates.

B.) Sold or gave away the CUSTOMER's NPI including account access.

-AND/OR-

Sold or gave away the CUSTOMER's NPI account information, AND, sold or gave away software that allow the Recipient to gain access to the CUSTOMER's account.

C.) Promoted, Facilitated, and Participated in Telemarketing Fraud.

D.) Threatened to cause the CUSTOMER Economic Ruin.

Violating the CUSTOMER's Constitutional Right-

"TO BE SECURE IN HIS PERSON, HOUSE, PAPERS, AND EFFECTS"

## FACTS

1.) In late July of 2009, the CUSTOMER's Girlfriend answered a call at the CUSTOMER's house from a company that stated that they were calling on behalf of the BANK, the company identified it's self as CROSS COUNTRY HOME SERVICES.  The Cross Country Home Services representative told the CUSTOMER's Girlfriend that it was important that the CUSTOMER call Cross Country Home Services back before 5:00 p.m. that day.

2.) The CUSTOMER returned home after 5:00p.m. and did not attempt to return the call to Cross Country Home Services, because the CUSTOMER did not recognize the name and felt no need to respond.

3.) The CUSTOMER at the request of the BANK, uses on-line banking to reduce the BANK's paperwork and mailing costs.

4.) After numerous NSF charges, the CUSTOMER realizes that, (as a welder and sign builder), his math is not that bad.

5.) On Sat. Nov. 2009, the CUSTOMER went to a local branch of the BANK and asked the branch manager to help the CUSTOMER review the account activity and try to find the problem.  The branch manager showed the CUSTOMER recurring charges from Cross Country Home Services and asked the CUSTOMER what that was.  The CUSTOMER told the branch manager that there was not supposed to be any charges from Cross Country Home Services and that the CUSTOMER did not know what Cross Country Home Services was.

6.) The branch manager called Cross Country Home Services and handed the phone to the CUSTOMER, then adjusted the computer screen and mouse as to where the CUSTOMER could see the screen as he talked to the Cross Country Home Service representative.  The branch manager took some paperwork over to the cashiers station.

7.) The CUSTOMER gave the CUSTOMER's information to the Cross Country Home Service representative and asked why his account was being

charged. The Cross Country Home Service representative informed the CUSTOMER that the CUSTOMER had purchased a Home Service Warranty Package by telephone in July for $39.95 a month and began in August. The CUSTOMER told the Cross Country Home Services representative that the CUSTOMER did not purchase a home warranty package and that the CUSTOMER does not own a house. The Cross Country Home Service representative told the CUSTOMER that, as a non-homeowner, the CUSTOMER was not qualified to purchase a home warranty. The Cross Country Home Services representative asked the CUSTOMER to confirm the CUSTOMER's home mailing address so that Cross Country Home Services could mail a refund check to the CUSTOMER's home. The CUSTOMER confirmed the address and asked why Cross Country Home Services could not refund the money the same way they had taken it. The Cross Country Home Services representative informed the CUSTOMER that "that is not the way Cross Country Home Services provides refunds".

8.) The CUSTOMER asked the Cross Country Home Services representative where Cross Country Home Services obtained the CUSTOMER's personal and banking account access information. The Cross Country Home Services representative told the CUSTOMER that all of the information "was supplied by BANK OF AMERICA".

9.) The branch manager returned when the call ended and asked the CUSTOMER what he had found out. The CUSTOMER told her the details and she told the CUSTOMER that he should contact the BANK's FRAUD Department.

10.) On Mon. Nov. 30, 2009, the CUSTOMER contacted the BANK's customer service representative and explained the situation. The BANK's customer service representative told the CUSTOMER that "the only way any of the NSF fees could be returned was if Cross Country Home Services directly deposited the money back into the CUSTOMER's account". The CUSTOMER advised the BANK's customer service representative that the Cross Country Home Services representative had stated that "BANK OF AMERICA" supplied all of the CUSTOMER's account information and access codes and that the CUSTOMER was going to file a complaint with the ARIZONA STATE ATTORNEY GENERAL.

11.) On Wed. Dec. 2, 2009, the Customer did file a complaint with the ARIZONA STATE ATTORNEY GENERAL and also with Office of the Comptroller of Cash (OCC).    Exhibits 1 and 2.

12.) About one week later, Dec. 9 or 10, 2009, a BANK customer service representative called the CUSTOMER to advise the CUSTOMER about the negative balance in the CUSTOMER's checking account and asked if the CUSTOMER could manage to deposit money into the account to get it current. The CUSTOMER explained to the BANK's customer service representative what was going on and that the CUSTOMER had already informed the BANK prior to this call. The CUSTOMER informed the BANK's customer service representative that, under the circumstances, the CUSTOMER was not going to deposit any more money into the account. The CUSTOMER informed the BANK's customer service representative about a pre-arranged agreement with the BANK that required a BANK arranged withdrawl of $45.00

on Dec. 15, 2009 for the CUSTOMER's BANK OF AMERICA Visa Card payment.  The CUSTOMER asked the BANK's customer service representative how the BANK would handle the withdrawl with the Account being in the OVERDRAWN situation it was and the BANK customer service representative told the CUSTOMER that the GENERAL BANK RULE IS TO CLOSE THE ACCOUNT.  This could void the agreement the CUSTOMER had with the BANK regarding reduced intrest fees that was part of the automatic withdrawls from the CUSTOMER's CHECKING ACCOUNT.  The CUSTOMER became angry and pointed out to the BANKS customer service representative that the FRAUD INNITIATED BY THE BANK WAS THE PROBLEM WITH THE ACCOUNT.  The CUSTOMER asked the BANK's customer service representative what his name was and for an I.D. #, the BANK's customer service representative provided the information to the CUSTOMER.  The CUSTOMER told the BANK's customer service representative that the CUSTOMER had also recorded the call.
Exhibits 3 and 4.  (Customer Credit Card Agreement and transcript and MP3 of BANK's Customer service representative recording)

13.) About two days later, Dec. 11 or 12, the CUSTOMER recieved an E-mail from the BANK requesting that the CUSTOMER fill out a survey about the CUSTOMER's experience with the BANK's Customer Service Department.  The survey's language implied that the CUSTOMER would have caused any fault, and asked for details about the incident that caused the CUSTOMER to contact the BANK's customer service department.  The CUSTOMER correct the tone of survey in the "COMMENTS WINDOW" and explained what the BANK had done to the CUSTOMER with regard to the FRADULENT charges from

Cross Country Home Services. The CUSTOMER submitted the answers to the survey. Exhibit 5  (The BANK's request letter for the CUSTOMER to complete the survey)

14.) On Dec. 17, 2009, the CUSTOMER printed a copy of his On-line Checking Account Statement. The CUSTOMER noted that on Dec. 11, 2009, the CUSTOMER recieved an ELECTRONIC refund from CROSS COUNTRY HOME SERVICES which was credited to the CUSTOMER's Checking Account. The CUSTOMER also noted that on Dec. 16, 2009, the BANK, as per the aforementioned Bank Of America Visa Card Repayment Agreement (Exhibit 3), issued Check# 9117 for the Visa Card Payment. And, on Dec. 17, 2009, the exact amount of Check# 9117 had been Credited to the CUSTOMER's Checking Account and an NSF fee was Charged. Exhibit 6  (Copy of the CUSTOMER's On-line Checking Account Statement on Dec. 17, 2009)

15.) About Dec. 18, 2009, the CUSTOMER recieved a letter from **TOTAL PROTECT** HOME SERVICE PLAN. The letter was dated Dec. 11, 2009. The letter stated that the CUSTOMER's money had been "REFUNDED DUE TO A CUSTOMER SERVICE GESTURE". The refund had been ELECTRONICALLY transfered back to the CUSTOMER's Checking Account. Exhibit 7  (Total Protect Home Service Plan Refund Letter)

16.) About Dec. 20, 2009, the CUSTOMER recieved an NSF notice from the BANK showing that Check# 9117 had been returned and showed the overdrawn amount to be exactly TEN DOLLARS HIGHER THEN THE ON-LINE STATEMENT FROM DEC. 17, 2009. The NSF notice

was dated Dec. 18, 2009. The NSF notice describes the OVERDRAFT as an ELECTRONIC PAYMENT and instructs the CUSTOMER to deposit funds to prevent an EXTENDED OVERDRAWN BALANCE CHARGE. within 5 business days TO COVER THE AMOUNT OF THE OVERDRAFT BALANCE, **PLUS ANY FEES.** The Bank Of America Visa Card Payment is exactly TEN DOLLARS HIGHER than the NSF FEE. The NSF notice shows that the ELECTRONIC PAYMENT WAS RETURNED.

Exhibit 8  (The BANK's NSF notice to the CUSTOMER dated Dec. 18, 2009)

Exhibit 9  (Copy of Check# 9117, written to FIA Card Services, N.A. for the amount of $45.00, on Dec. 15, 2009)

17.) About Dec. 23, 2009, The CUSTOMER recieved another notice from the BANK.  This notice states that the Checking Account has been OVERDRAWN since Dec. 17, 2009, and that the CURRENT UNPAID BALANCE, which is EXACTLY TEN DOLLARS LOWER than the BANK's NSF notice dated Dec. 18, 2009.  The BANK's notice DEMANDS that the CUSTOMER MAKE A DEPOSIT IMMEDIATELY OR THAT **BANK OF AMERICA WILL BE FORCED TO CLOSE THE ACCOUNT. THIS NOTICE THREATENS TO SEND A REPORT TO CHEXSYSTEMS, INC. AN ACCOUNT VERIFICATION SERVICE AND INFORMS THE CUSTOMER THAT THIS REPORT COULD RESULT IN THE CUSTOMER BEING UNABLE TO ESTABLISH AN ACCOUNT IN ANY OTHER FINANCIAL INSTUTION FOR UP TO FIVE YEARS, EVEN IF THE DEBT IS REPAYED, TO CAUSE THE CUSTOMER GREAT INCONVENIENCE.  THIS NOTICE ALSO THREATENS TO REFER THE ACCOUNT TO A COLLECTION AGENCY AND THAT ANY BALANCE OWED COULD BE SUBJECT TO COLLECTION FEES AND OR INTREST CHARGES.**

Exhibit 10 (The BANK's notice to the CUSTOMER dated Dec. 21, 2009)

18.) On the evening of Dec. 23, or 24, 2009, the CUSTOMER used the BANK's On-line Customer Service. The CUSTOMER had an Instant Message (IM) Session with one of the BANK's On-line Customer Service Representatives. The CUSTOMER told the on-line representative about; THE THREATNING LETTER, THE CREDIT CARD AGREEMENT, CHECK #9117, THE SURVEY, THE RECORDED CALL, THE BRANCH MANAGER, THE NSF FEES, CROSS COUNTRY HOME SERVICES, AND **THE COMPLAINT FILED WITH THE ARIZONA STATE ATTORNEY GENERAL's OFFICE.** The on-line customer service representative requested the Arizona State Attorney General Complaint number. The CUSTOMER provided the information and the on-line customer service said he would pass along the information.
THE CUSTOMER DOES NOT HAVE A COPY OF THE IM DISCUSSION.

19.) On Jan. 7, 2010, The CUSTOMER reviewed his On-line Checking Account Statement, and discovered that CHECK# 9117 HAD BEEN RE-ISSUED ON DEC. 22, 2009, AND RETURNED ON DEC. 23, **ANOTHER NSF FEE HAD BEEN ADDED AND THE CREDIT CARD WAS NOT PAID. THE CUSTOMER ALSO NOTICED THAT THERE WAS A CREDIT TO THE ACCOUNT ON JAN. 5, 2010, NOTED "RETURN OF NSF FEES", AND THAT THE TWO NSF FEES FROM CHECK# 9117 HAD BEEN SUBTRACTED FROM THE "RETURN OF NSF FEES" CREDIT.**
Exhibit 11 and 12  (Copy of Check# 9117 from Dec. 22, 2009 and the CUSTOMER's Checking Account print out from Jan 7, 2010)

20.) On Jan. 8, 2010, the CUSTOMER recieved a letter from a Customer Advocate in the Office of the CEO and President of the BANK. The letter expressed regret for the "CHALLENGES"

and any "INCONVIENCE" the CUSTOMER may have experienced as a result of the "ACTIVITY" in the CUSTOMER's Checking Account. The letter stated that after a review, the Customer Advocate was unable to "IDENTIFY" any BANK error, but has refunded the NSF fees to the CUSTOMER's Checking Account as a "COURTESY" and hoped the CUSTOMER would view it as a "REFLECTION OF THE BANK's COMMITTMENT TO CUSTOMER SERVICE". The letter points out that Customers are supposed to monitor their accounts for unauthorized charges. The letter goes on to suggest that the CUSTOMER should share any information the CUSTOMER has, and even TALKING TO CROSS COUNTRY HOME SERVICES AND REPORTING BACK TO THE BANK. Exhibit 13 (The BANK's Customer Advocate Letter of Jan. 5, 2010)

21.) On the evening of Jan. 8, or 9, 2010, the CUSTOMER contacted the BANK's On-line Customer Service again and told the on-line customer service representative to tell the Customer Advocate that his resolution was not acceptable and to try harder. THE CUSTOMER DOES NOT HAVE A COPY OF THIS IM DISCUSSION.

22.) On Jan. 11, 2010, the CUSTOMER recieved a follow up letter from The ARIZONA STATE ATTORNEY GENERAL, the letter stated that "the State can not represent individuals" and suggusted other alternatives if the BANK's resolution was not satisfactory. A copy of a letter from the BANK's Customer Advocate was attached. The Customer Advocate's letter implies that a resolution had been reached between the BANK and the CUSTOMER. The letter instructed the ARIZONA STATE ATTORNEY GENERAL to contact the CUSTOMER if they had any questions about the "RESOLUTION" of

1  the matter.  The ARIZONA STATE ATTORNEY GENERAL stated in the
2  letter that "Your Complaint Will Remain On File To Assist This
3  Office In IDENTIFYING And TRACKING A POSSIBLE PATTERN OF
4  FRAUDLUENT CONDUCT That Could Warrant Future Action Under
5  Arizona's Consumer Statues.
6  Exhibits 14 and 15 (Arizona Attorney General follow up letter
7  and the BANK's Customer Advocate Letter)

### DEMAND

The PLAINTIFF respectfully seeks relief in the following manner:

I.)  ACTUAL DAMAGES                                              $      120.26

    $50.26 Un-refunded NSF Fees of Dec. 11, 2009
    $70.00 NSF Fees from CHECK# 9117, Dec. 17, and
    Dec. 23, 2009.  CREDIT CARD PAYMENT.

II.) COURT COSTS                                                 $      350.00

III.) COMPENSATORY DAMAGES                                       $1,000,000.00

   A.) BREACH OF CONTRACT

       The DEFENDENT Sold or Shared the PLAINTIFF's
       Checking Account Access Information with
       CROSS COUNTRY HOME SERVICES, AN OUTSIDE
       MARKETER, **VIOLATING THE 2005 BANK OF AMERICA
       PRIVACY POLICY FOR CONSUMERS  FORM 00-36-0302B
       10/2004  FO1-7003-8  M-73531**

B.) TORTIOUS CRIMINAL ACT; **FACILITATION OF THEFT**

The DEFENDANT Sold or Shared the PLAINTIFF's NPI including the BANK OF AMERICA Checking Account Access Codes, AND/OR Sold or Shared the Checking Account Information, AND provided, Directly or Indirectly, Encryption Software that enabeled CROSS COUNTRY HOME SERVICES to make Unauthorized Withdrawals from the PLAINTIFF's Checking Account. In VIOLATION of PUBLIC LAW 106-102, 15 U.S.C § 6801, et seq. Sec. IX, A. PROHIBITION ON SHARING ACCOUNT NUMBERS FOR MARKETING PURPOSES.

C.) TORTIOUS CRIMINAL ACT: **FACILITATION OF FRAUD**

The DEFENDANT Sold or Shared the PLAINTIFF's Public Information (PI), the Plaintiff's address and Telephone Number along with the PLAINTIFF's NPI, THAT THE PLAINTIFF HELD A CHECKING ACCOUNT WITH BANK OF AMERICA, EXPONENTIALLY INCREASING THE PROBABILITY THAT CROSS COUNTRY HOME SERVICES WOULD EVER CONTACT THE PLAINTIFF. CROSS COUNTRY HOME SERVICES UTILIZED THE TELEPHONE SYSTEM TO PURPORT FRAUD AGAINST THE PLAINTIFF. In VIOLATION of PUBLIC LAW 106-102, 15 U.S.C. §§ 6101-6108, PROHIBITION ON ASSISTING OR FACILITATING TELEMARKETING FRAUD. 16 C.F.R. PART 310

D.)  TORTIOUS CRIMINAL ACT;  **EXTORTION**

The DEFENDANT, by TELEPHONE and MAIL, ASSURED The PLAINTIFF THAT HE WOULD FACE EXTREME HARDSHIP AND FINANCIAL RUIN UNLESS HE COMPLY WITH THE DEFENDANT'S DEMAND.  In VIOLATION of 18 U.S.C., 1951, Sec. a, b(2).  INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE.

IV.) THAT THE AFORE MENTIONED CRIMES COMMITED BY THE DEFENDANT DID CREATE AND HAS MAINTAINED A SITUATION THAT DENIES THE PLAINTIFF HIS CONSTITUTIONAL RIGHT "TO BE SECURE IN HIS PERSON, HOUSE, PAPERS, EFFECTS". In VIOLATION of 18 U.S.C., Part 1, Chapter 13 § 241. **CONSPIRACY AGAINST RIGHTS**

TOTAL RELIEF SOUGHT BY PLAINTIFF                $1,000,470.26

Dated: 4/16/2010

John H. Azeltine, Jr.
2419 S. Hemlock Strav.
Tucson, AZ  85713
(520) 327-3251 H
(520) 260-1173 C
tucsonjohn@cox.net